Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907-586-2751
F: 907-463-5891
E: twaldo@earthjustice.org
E: ericj@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES
    DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360-534-9900
F: 360-534-9909
E: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ORGANIZED VILLAGE OF KAKE, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.,* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | Case No. 1:09-cv-00023-JWS |
| | ) | |
| STATE OF ALASKA and ALASKA FOREST ASSOCIATION, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |
| | ) | |

**PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1)**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ........................................................................................................ 2

   I.   ROADLESS AREAS OF THE NATIONAL FORESTS. ................................. 2

   II.  ROADLESS AREAS OF THE TONGASS. ..................................................... 3

   III.  THE 2001 ROADLESS RULE. ........................................................................ 5

   IV.  THE 2003 TEMPORARY TONGASS EXEMPTION. .................................... 7

   V.  THE 2005 ATTEMPTED NATIONWIDE REPEAL OF THE
       ROADLESS RULE. ........................................................................................ 9

   VI.  ROADLESS AREA TIMBER SALES ON THE TONGASS. ......................... 9

   VII. THIS CASE. ................................................................................................... 10

ARGUMENT ............................................................................................................ 11

   I.   THE TONGASS EXEMPTION WAS ARBITRARY. ................................... 11

       A.   Standards of Review. ............................................................................ 11

       B.   The Decision to Exempt the Tongass from the Roadless Rule was
           Arbitrary. ............................................................................................ 12

           1.   The Evidence does Not Show Interference with Community
               Connections. ............................................................................... 12

               a.   The Roadless Rule does not prevent construction of
                   roads to connect communities in Southeast Alaska. ............................ 13

                   *Federal Aid Highways*. ................................................. 13

                   *Logging roads as community links*. ............................... 15

               b.   The Roadless Rule does not prevent construction of
                   utility lines. ....................................................................... 16

           2.   No Job Loss was Attributable to the Roadless Rule. .................... 18

           3.   The Tongass Exemption Could Not Reduce Uncertainty. ............ 20

II.   THE ROADLESS EXEMPTION VIOLATED NEPA. ...................................................20

      A.   Standards of Review. ............................................................................21

      B.   NEPA Requires Federal Agencies to Consider Alternatives to
           their Proposals.......................................................................................21

      C.   The Agency Unlawfully Failed to Analyze Alternatives that
           Would Address the Stated Purposes of the Tongass Exemption. ........................22

III.  THE EXEMPTION AND ACTIONS IMPLEMENTING IT SHOULD
      BE VACATED, AND THE ROADLESS RULE REINSTATED ON
      THE TONGASS. ...............................................................................................24

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alaska Wilderness Recreation and Tourism Association v. Morrison,*
　　67 F.3d 723 (9th Cir. 1995) ...........................................................................4, 21

*Bob Marshall Alliance v. Hodel,*
　　852 F.2d 1223 (9th Cir. 1988) ......................................................................21, 22

*Burlington Truck Lines v. United States,*
　　371 U.S. 156 (1962)...........................................................................................11

*California ex rel. Lockyer v. U.S. Department of Agriculture,*
　　459 F. Supp. 2d 874 (N.D. Cal. 2006) ..........................................................9, 23

*California ex rel. Lockyer v. U.S. Department of Agriculture,*
　　575 F.3d 999 (9th Cir. 2009) ...............................................2, 9, 19, 21, 22, 25

*Citizens for a Better Henderson v. Hodel,*
　　768 F.2d 1051 (9th Cir. 1985.............................................................................22

*City of Carmel-by-the-Sea v. U.S. Department of Transportation,*
　　123 F.3d 1142 (9th Cir. 1997) ...........................................................................22

*City of Tenakee Springs v. Block,*
　　778 F.2d 1402 (9th Cir. 1985) .............................................................................4

*City of Tenakee Springs v. Clough,*
　　915 F.2d 1308 (9th Cir. 1990) .............................................................................4

*Center for Biological Diversity v. National Highway Traffic Safety Administration,*
　　538 F.3d 1172 (9th Cir. 2008) ...........................................................................11

*Center for Biological Diversity v. U.S. Forest Service,*
　　349 F.3d 1157 (9th Cir. 2003) ...........................................................................21

*Friends of Southeast's Future v. Morrison,*
　　153 F.3d 1059 (9th Cir. 1998) .............................................................................4

*Friends of the Earth v. Laidlaw Environmental Services,*
　　528 U.S. 167 (2000)...........................................................................................10

*Hanlon v. Barton,*
　　740 F. Supp. 1446 (D. Alaska 1988) ...................................................................4

*Hoonah Indian Association v. Morrison,*
  170 F.3d 1223 (9th Cir. 1999) ................................................................4

*Idaho Farm Bureau Federation v. Babbitt,*
  58 F.3d 1392 (9th Cir.1995) ..................................................................24

*International Ladies' Garment Workers' Union v. Donovan,*
  772 F.2d 795 (D.C. Cir. 1983) ..............................................................11

*Kootenai Tribe of Idaho v. Veneman,*
  313 F.3d 1094 (9th Cir. 2002) ....................................................6, 23, 24

*Motor Vehicle Manufacturers Association of the U.S. v. State Farm Mutual*
  *Automobile Insurance Co.,*
  463 U.S. 29 (1983) ................................................................................11

*Mt. Diablo Hospital v. Shalala,*
  3 F.3d 1226 (9th Cir. 1993) ..................................................................11

*Natural Resources Defense Council v. Houston,*
  146 F.3d 1118 (9th Cir. 1998) ..............................................................24

*Natural Resources Defense Council v. U.S. Forest Service,*
  421 F.3d 797 (9th Cir. 2005) ....................................................9, 22, 23, 24

*National Tour Brokers Association v. United States,*
  591 F.2d 896 (D.C. Cir. 1978) ..............................................................20

*Oregon Natural Desert Association v. Bureau of Land Management,*
  531 F.3d 1114 (9th Cir. 2008) ..............................................................22

*Pacific Coast Federation of Fishermen's Associations v. National Marine*
  *Fisheries Service,*
  265 F.3d 1028 (9th Cir. 2001) ..............................................................11

*Paulsen v. Daniels,*
  413 F.3d 999 (9th Cir. 2005) ................................................................24

*Pit River Tribe v. U.S. Forest Service,*
  469 F.3d 768 (9th Cir. 2006) ..........................................................21, 22

*Securities and Exchange Commission v. Chenery Corp.,*
  332 U.S. 194 (1947) ..............................................................................11

*Sierra Forest Legacy v. Rey,*
  577 F.3d 1015 (9th Cir. 2009) .........................................................21, 23

_____
*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS

iv

*Western Oil & Gas Association v. U.S. Environmental Protection Agency,*
    633 F.2d 803 (9th Cir.1980) ............................................................24

*Wilderness Workshop v. U.S. Bureau of Land Management,*
    531 F.3d 1220 (10th Cir. 2008) ....................................................5, 17

*Wyoming v. U.S. Department of Agriculture,*
    414 F.3d 1207 (10th Cir. 2005) ........................................................6

*Wyoming v. U.S. Department of Agriculture,*
    570 F. Supp. 2d 1309 (D. Wyo. 2008)..............................................6

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A)...........................................................................11, 24

5 U.S.C. § 706(2)(D)...............................................................................21

16 U.S.C. § 529......................................................................................12

16 U.S.C. § 531(a) .................................................................................12

16 U.S.C. § 551......................................................................................12

16 U.S.C. § 1608(a) ...............................................................................12

16 U.S.C. § 1611(a) ...............................................................................19

23 U.S.C. § 317(b)..................................................................................14

42 U.S.C. § 4332(2)(C)(iii).....................................................................22

42 U.S.C. § 4332(2)(E)...........................................................................22

## FEDERAL REGULATIONS

36 C.F.R. §§ 294.10-.14*.........................................................................1

36 C.F.R. § 294.12*...............................................................................1, 5

36 C.F.R § 294.12(b)(6)*......................................................................5, 13

* As published in 66 Fed. Reg. 3244, 3272-73 (Jan. 12, 2001) and 68 Fed. Reg. 75,136, 75,146 (Dec. 30, 2003).

---

*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS
v
Case 1:09-cv-00023-JWS    Document 42    Filed 07/02/10    Page 6 of 37

36 C.F.R. § 294.13* ...........................................................................................1, 5

36 C.F.R. § 294.13(b)(2)* .............................................................................5-6, 16

36 C.F.R. § 294.14(d)* .................................................................................1, 5, 7

40 C.F.R. § 1502.1 ............................................................................................21

40 C.F.R. § 1502.14(a)......................................................................................21

40 C.F.R. § 1505.2 ..............................................................................................7

## FEDERAL REGISTER

64 Fed. Reg. 56,306 (Oct. 19, 1999)...................................................................2

66 Fed. Reg. 3244 (Jan. 12, 2001) .....................................................................1

68 Fed. Reg. 41,864-69 (July 15, 2003). ............................................................7

68 Fed. Reg. 75,136 (Dec. 30, 2003)..................................................................1

70 Fed. Reg. 25,654 (May 13, 2005) ..................................................................9

* As published in 66 Fed. Reg. 3244, 3272-73 (Jan. 12, 2001) and 68 Fed. Reg. 75,136, 75,146 (Dec. 30, 2003).

*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS
vi
Case 1:09-cv-00023-JWS    Document 42    Filed 07/02/10    Page 7 of 37

# INTRODUCTION

A coalition of tourism businesses, an Alaska Native tribal government, and conservation groups seeks to set aside a "temporary" rule, now over six years old, exempting Alaska's Tongass National Forest from a rule adopted to protect the remaining pristine, wild areas of the entire national forest system.

In 2001, following an extensive public process with a full Environmental Impact Statement (EIS) and hundreds of public hearings around the country, the Secretary of Agriculture adopted the Roadless Area Conservation Rule. 66 Fed. Reg. 3244, 3272-73 (Jan. 12, 2001) (adopting 36 C.F.R. §§ 294.10-.14) (attached as Ex. 11) ("Roadless Rule" or "Rule").[1] The rule prohibits most new roads and most logging in undeveloped "roadless areas" of the national forests. *Id.* §§ 294.12-.13. In 2003, without undertaking an EIS or a single public hearing, the agency adopted an exemption for the Tongass that was, on its face, to last only until the agency completed a previously-announced rulemaking regarding the long-term application of the Roadless Rule in Alaska. 68 Fed. Reg. 75,136, 75,146 (Dec. 30, 2003) (amending 36 C.F.R. § 294.14(d)) (attached as Ex. 24) ("Tongass Exemption" or "Exemption"). The Alaska-specific rulemaking was never commenced, and the "temporary" Tongass Exemption remains in effect.

The rationale for the temporary Tongass Exemption, as set forth in a Record of Decision (ROD) published in the Federal Register, was arbitrary. Federal Defendants relied on assertions that were unsupported or contradicted by the facts in the record, reversed previous factual findings without explanation, ignored important aspects of the problem, and failed to consider obvious alternative courses of action. Federal Defendants also violated the National Environmental Policy Act (NEPA) by refusing to prepare an EIS, which would have assessed various options for addressing their concerns without the draconian step of outright exempting the forest from the Roadless Rule.

Plaintiffs Organized Village of Kake, et al., request that this Court set aside the Tongass Exemption, reinstate the Roadless Rule, and vacate agency actions in conflict with it. This relief is needed to avoid harm to their subsistence, business, and recreational interests.

---

[1] For reasons discussed below, *see infra* pp. 6, 9, the Roadless Rule (including the Tongass Exemption) does not currently appear in the Code of Federal Regulations. Citations to it in this brief will be to the Federal Register notices attached as Exhibits 11 and 24.

# BACKGROUND

## I.     ROADLESS AREAS OF THE NATIONAL FORESTS.

Over a period of several decades, the Forest Service has repeatedly grappled with the controversial issue of permitting development in the remaining wild, unroaded portions of the national forests.  In 1972, the agency initiated the Roadless Area Review and Evaluation (RARE), followed by RARE II, which resulted in a nationwide inventory of roadless areas completed in 1979.  Ex. 9 at 19.  Since that time, further reviews and inventories have occurred in connection with individual national forest management plans.  *Id.*; *see Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999, 1005-06 (9th Cir. 2009).  The Forest Service explained in 2000:

> The controversy continues today, accompanying most proposals to harvest timber, build roads, or otherwise develop inventoried roadless areas.  The volume of appeals, litigation, and congressional debate over the last 20 years illustrates the importance that many Americans attach to the remaining roadless portions of [National Forest System (NFS)] lands.

Ex. 9 at 19 (2000 Roadless Rule FEIS).

In 1998, the Forest Service determined that its backlog of deferred maintenance for roads, bridges, and culverts was $8.4 billion and growing every year, for an expanding system that already comprised over 386,000 miles of national forest roads, plus 60,000 miles of unauthorized and unclassified roads.  *Id.*  Accordingly, the Chief of the agency temporarily suspended new road construction in most roadless areas, pending preparation of a final roads policy.  *Id.* at 19-20.

Many of the public comments on this policy called for permanent protection of roadless areas.  *Id.* at 20.  Against this backdrop, the President, on October 13, 1999, issued a memo to the Secretary of Agriculture directing the Forest Service "to develop, and propose for public comment, regulations to provide appropriate long-term protection for most or all of these currently inventoried 'roadless' areas…."  Ex. 4 at 2.  The Forest Service issued a notice of intent to prepare such regulations shortly thereafter.  Ex. 5 (64 Fed. Reg. 56,306 (Oct. 19, 1999)); *see* Ex. 9 at 20-21 (2000 FEIS).

Public participation in this proposal was unprecedented for a federal rulemaking.  Besides preparing a draft and a final EIS, the agency held more than 430 public meetings around the country, attended by 23,000 people, of whom 7,000 spoke publicly.  The agency received nearly

1.2 million written public comments on the proposed rule, including 60,000 original letters. Ex. 9 at 21 (2000 FEIS).

The EIS included a chapter explaining the "purpose and need" for the rule. It stated that the rule was needed because of budget constraints, controversy including appeals and litigation, and the "habitat fragmentation and changes in native plant and animal communities" caused by roads and timber harvest in roadless areas. *Id.* at 28-29. It also set forth a lengthy rationale about the need for a nationally uniform rule, noting that even well-informed local management decisions often miss the importance of roadless areas to the Nation as a whole, and of their loss: "[W]hen these individual decisions are aggregated over time, and throughout the country, the resulting ecological and social outcomes resulting from the loss of roadless areas may become substantial." *Id.* at 29; *see also* Ex. 11 at 2-5 (2001 ROD).

## II. ROADLESS AREAS OF THE TONGASS.

The Tongass received careful, individualized consideration throughout the rulemaking process. The original notice of intent stated: "In light of the recent revision of the Tongass National Forest Land management plan and the transition in the timber program in Southeast Alaska, we specifically solicit comments on whether or not the proposed rule should apply to the Tongass…." Ex. 5 at 2 (col. 2). The proposed rule published for public comment would have postponed applicability of the rule in the Tongass until 2004, at which point the agency would reevaluate the question in light of then-existing conditions. Ex. 6 at 5-6, 7 (col. 1), 14 (proposed 36 C.F.R. §§ 294.12(c), 294.13(e)). The draft EIS published with the proposed rule also considered four Tongass-specific alternatives, which would have excluded the Tongass altogether, delayed decision on it, or limited its geographical scope. Ex. 7 at 15-18. These were in addition to the protection alternatives considered for the rest of the national forests, which could also apply to Tongass roadless areas. *Id.* at 15.

The Tongass shared the fiscal constraints that motivated the Roadless Rule nationally. In 2000, the Tongass had a $13.5 million backlog in deferred road maintenance on its nearly 5,000 miles of classified and other roads. Ex. 9 at 84, 71-72 (2000 FEIS); Ex. 1 at 5 (1997 Plan EIS).[2]

_____

[2] By 2003, when the Tongass Exemption was adopted, this estimate had ballooned. A Forest Service contractor concluded that a 2001 estimate of $32.1 million "is a substantial underestimate of deferred maintenance cost…." Ex. 17 at 9.

_____

The Forest Service also recognized the high ecological values of roadless areas on the Tongass, noting that, unlike other forests, it has few threatened or endangered species. "The forest's high degree of overall ecosystem health is largely due to the quantity and quality of its inventoried roadless areas and other special designated areas." Ex. 9 at 81 (2000 FEIS). The agency further recognized the unusual vulnerability of the region's island ecosystem: "Because ecosystems in Southeast Alaska are naturally fragmented and may be less resilient to further fragmentation, the loss of inventoried roadless area conditions may pose a high risk to species existence and persistence." *Id.* at 82. The high remaining ecosystem values attributable to roadless areas also contributed to a vibrant tourism industry as well as commercial, sport, and subsistence hunting and fishing. *Id.* at 82-84. The FEIS expressly noted that in the region "the presence of roads is extensively associated with reduced subsistence productivity." *Id.* at 83.

The agency recognized that these resources had more than merely local significance: "The ecologically unique character of the Tongass and current high degree of ecosystem health are important nationally and globally when considered in the context of changing social values." *Id.* at 100. Describing a scenario with limited timber production that maintains existing natural conditions, the agency noted: "The rare opportunity to apply this approach to a large, unique, and largely intact ecosystem, before further incremental compromises to the ecosystem occur[], is what makes the Tongass alternatives consequential at a national scale." *Id.* at 101.

Rounding out the principal stated purposes for the Rule, the Tongass exemplifies the controversy, appeals, and litigation induced by proposals for new roads and clearcuts in roadless areas. In 2000, there was already a long history of challenges by municipalities, tribes, Native clan leaders, tourism businesses, and conservation groups to old growth timber sales in the Tongass, most particularly those in roadless areas. *See, e.g., City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985); *Hanlon v. Barton*, 740 F. Supp. 1446 (D. Alaska 1988); *City of Tenakee Springs v. Clough*, 915 F.2d 1308 (9th Cir. 1990); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998); *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999). *See also* Exs. 12 & 16 (in case fully briefed at time of Roadless Rule, court enjoins roadless area logging). Not surprisingly, the 2000 Roadless Rule FEIS concluded that the alternative in which the Tongass was included immediately ("Tongass Not Exempt") would achieve the "[g]reatest savings in appeals and litigation costs…." Ex. 9 at 61.

III.    THE 2001 ROADLESS RULE.

For these reasons, the Department of Agriculture (USDA) ultimately decided to include the Tongass in the Roadless Rule, applicable immediately, but with a provision grandfathering timber sales for which a draft EIS had already been released. Ex. 11 at 12-13, 24, 31 (2001 ROD (adopting 36 C.F.R. § 294.14(d))). The grandfather clause created a pool of 852 million board-feet (mmbf) available for logging, which was estimated at that time to satisfy seven years of market demand. *Id.* at 24 (col. 2).

The Roadless Rule prohibits most road construction and most tree-cutting in "inventoried" roadless areas, *id.* at 30-31 (36 C.F.R. §§ 294.12-.13), which are generally those greater than 5,000 acres. Ex. 9 at 66 (2000 FEIS). However, it contains several important exceptions to both prohibitions, including those for public safety, to protect legal rights (including access to inholdings and for mining, *see id.* at 74-75, 80), to improve habitat, and to reduce wildfire risks, among others. Ex. 11 at 30-31 (36 C.F.R. §§ 294.12-.13).

An important exception to the road construction prohibition is for Federal Aid Highway projects. *Id.* § 294.12(b)(6). The Roadless Rule was not intended to prevent construction of federal or state highways, which normally receive federal funding under the federal aid highway program established in Title 23 of the U.S. Code. State and interstate highways are planned cooperatively by the Federal Highway Administration and State Departments of Transportation, and the Secretary of Agriculture has authority to grant rights-of-way across national forests for this purpose. Ex. 8 at 2 (USFS memo). The Forest Service explained: "This exception maintains the Secretary's discretion as it already exists." Ex. 9 at 41 (2000 FEIS).

The Roadless Rule does not prohibit most types of development activity in roadless areas. It addresses "only those uses and activities likely to significantly alter landscapes." *Id.* at 29. Electric transmission lines, pipelines, mines, hydroelectric dams, visitor facilities, motor vehicle use, and all other developments other than roads and logging are allowed. The rule allows construction zones in which vehicles may be used, as long as they do not add to the forest road system. *See Wilderness Workshop v. U.S. BLM*, 531 F.3d 1220, 1226-28 (10th Cir. 2008) (allowing vehicle corridor for pipeline construction). An important exception to the general prohibition against cutting trees applies for logging "incidental to the implementation of a management activity not otherwise prohibited by this subpart." Ex. 11 at 31 (36 C.F.R.

§ 294.13(b)(2)). This ensures that otherwise permissible uses are not prohibited simply because they require some tree-cutting.

Thus, among the uses allowed by the Roadless Rule are utility lines, for which clearing of trees and use of construction vehicles is allowed. The Roadless Rule FEIS examined whether the Rule would affect utility lines and concluded that only a "couple" could potentially be affected in the West and that any effects would be "minimal." Ex. 9 at 77 (2000 FEIS).

While the Rule was under consideration, the Forest Service investigated the specific question whether it would adversely affect community road or utility connections in the Tongass, and concluded it would not. Julia Riber (one of two Project Directors) and Eric Johnston (an interdisciplinary team member), *see id.* at 103, 105, consulted with Region 10 (Alaska). In a briefing paper, they wrote: "Future major transportation routes are very likely, if not certain, to be Federal Aid Highway Projects. Thus, the Secretary would have discretion to approve such routes under the rule." Ex. 10. They also determined that communities on Prince of Wales Island were already connected by the existing road system, and that elsewhere most of the communities "are so isolated that roaded access is unlikely to be proposed." *Id.* Regarding transmission lines, they explained that roads in Southeast Alaska grow over quickly, making them expensive to maintain, and that recently built or approved electrical interties in the region did not include roads. *Id.*; *see also*, *e.g.*, Ex. 2 at 26 (Swan Lake Intertie FEIS) (explaining that, for a recently approved power line, building a road was more expensive and therefore rejected).

Nevertheless, a number of states and other parties, including Alaska and the Alaska Forest Association (AFA), immediately challenged the Roadless Rule. *See* Ex. 24 at 1 (col. 3) (Exemption ROD). Reversing a preliminary injunction against the Rule, the Ninth Circuit rejected the central claims advanced in most of these lawsuits. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002). However, a district court in Wyoming disagreed with the Ninth Circuit and, in July 2003, struck down the Rule in a decision that was later vacated when the appeal was dismissed as moot. *See Wyoming v. USDA*, 414 F.3d 1207 (10th Cir. 2005). Subsequently, the case was reinstated, the same district court struck down the rule again, and the appeal is now ripe for decision in the Tenth Circuit. *See Wyoming v. USDA*, 570 F. Supp. 2d 1309 (D. Wyo. 2008), *appeal argued*, Nos. 09-8075 & 08-8061 (10th Cir. Mar. 10, 2010).

IV.     THE 2003 TEMPORARY TONGASS EXEMPTION.

    While these cases were working their way through the courts, Alaska and AFA settled

theirs.  The out-of-court agreement required the federal defendants to publish in the Federal

Register "[a] proposed temporary regulation that would exempt the Tongass National Forest

from the application of the Roadless Rule until completion of the rulemaking process for any

permanent amendments to the Roadless Rule."  Ex. 20 at 2.  It also called for an Advance Notice

of Proposed Rulemaking to exempt both of Alaska's national forests—the Tongass and the

Chugach—permanently from the Roadless Rule.  *Id.*  The agreement did not require the agency

to adopt any particular final rule, or indeed any rule at all, but merely allowed the State and AFA

to reinstate their cases if they were dissatisfied with the actions of the federal defendants.  *Id.*

at 3.  The Forest Service promptly published the proposed rules, discharging its obligations under

the agreement.  Ex. 21 (68 Fed. Reg. 41,864-69 (July 15, 2003)).

    On December 30, 2003, USDA published the Tongass Exemption as a temporary final

rule.  Ex. 24.  On its face, the Exemption would last only until "the USDA promulgates a final

rule concerning application of this subpart within the State of Alaska [to which the agency

originally sought public comments in the July 15, 2003, second advance notice of proposed

rulemaking (68 FR 41864)]…."  *Id.* at 11 (36 C.F.R. § 294.14(d)) (brackets in original).  The

preamble repeatedly emphasizes the limited intended duration of the rule, using the words

"temporary," "temporarily," or "short term" to describe it seventeen times.  *Id.* at 1-3, 7-8, 10-11.

The preamble doubled as the agency's ROD, explaining in detail the rationale for its action as

required by NEPA regulations.  *Id.* at 1 (col. 2); *see* 40 C.F.R. § 1505.2.

    The agency did not prepare a new EIS for the temporary exemption, but rather relied on

the 2000 Roadless Rule FEIS.  Ex. 24 at 6  (col. 3) (Exemption ROD).  The agency prepared a

Supplemental Information Report (SIR), Ex. 23, concluding that there were no significant new

circumstances or new information requiring a supplement to that EIS.  "[T]he overall decision-

making picture is not substantially different now than it was in November 2000."  *Id.* at 59.

    The SIR found that this was specifically true as to community road and utility

connections.  Referring to the transportation and utility corridors identified in the Tongass forest

management plan, the report states:  "The Roadless FEIS notes that these roads, if they are in the

best public interest, could go forward.  . . .  The conclusion of this report is that no new

information has come to light that would alter the expectations of major roads or transportation

corridors or associated economic impacts estimates in the Roadless FEIS….” *Id.* at 41. Referring to both road and utility connections, the report notes that “new information or new circumstances have not been presented.” *Id.* at 40.

The Exemption ROD contains a section entitled “Why Is USDA Going Forward With This Rulemaking?” Ex. 24 at 2 (col. 3). It cites “the factors and issues described in this preamble,” *id.*, which focus on three principal concerns.

First, notwithstanding the contrary conclusions of both the 2000 FEIS and the SIR, the 2003 ROD announced that “the roadless rule significantly limits the ability of communities to develop road and utility connections….” *Id.* (col. 1). Indeed, it asserts that future connections—suddenly perceived as hindered by the Rule—“may be critical to economic survival of many of the smaller communities in Southeast Alaska.” *Id.* at 8 (col. 1). USDA, however, produced no examples of community road and utility connections that might actually be impeded by the Roadless Rule.

Second, the ROD expresses concern with timber industry employment and avers that “900 jobs could be lost in the long run in Southeast Alaska due to the application of the roadless rule.” *Id.* at 2 (col. 1). As with the community connections rationale, this assertion places the ROD at odds with the 2000 FEIS and the SIR. In the three years leading up to the Exemption ROD, logging levels on the Tongass averaged 44 mmbf/year. *Id.* at 6 (col. 1). The SIR explained that logging entirely outside of roadless areas could yield a realistic harvest level of 50-55 mmbf/year. Ex. 23 at 26-27; *see also* Ex. 9 at 88 (2000 FEIS). Thus, the evidence before the agencies showed that continued logging at or above 2003 levels could continue in perpetuity without any roadless area incursions and without the loss of one job.

Third, the ROD asserts that litigation creates uncertainty about implementation of the Roadless Rule, while the temporary exemption “reduces the potential for conflicts regardless of the disposition of the various lawsuits.” Ex. 24 at 3 (cols. 1 & 2). In so reasoning, the agency did not address its own prior conclusion that controversy, appeals, and litigation argued for keeping logging and road construction out of roadless areas. S*ee supra* pp. 3, 4. Nor did the ROD address the history of controversy surrounding Tongass roadless area logging, *see supra* p. 4, or how a merely temporary rule could reduce uncertainty.

Despite having a dramatically different purpose in 2003 than in 2000, USDA did not, in the Exemption ROD, consider any alternatives other than those addressed in the 2000 FEIS.

V.      THE 2005 ATTEMPTED NATIONWIDE REPEAL OF THE ROADLESS RULE.

USDA never adopted the Alaska-specific rule referenced in the temporary Tongass Exemption.  Instead, seventeen months later, the Department repealed the entire Roadless Rule nationwide, substituting a "state petitions" process.  70 Fed. Reg. 25,654 (May 13, 2005).  "This rule thus negates the need for the further Tongass-specific rulemaking anticipated by the 2003 rule."  *Id.* at 25,659 (col. 2).

In October 2006, however, in response to a suit filed by four western States and several conservation groups, a federal district court struck down the nationwide repeal, finding that the Department failed to comply with the procedures required by NEPA and the Endangered Species Act.  *Cal. ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874 (N.D. Cal. 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009).  The agency had repealed the rule and replaced it with an entirely different approach without conducting any environmental review or consulting with the Fish and Wildlife Service regarding threatened and endangered species.  459 F. Supp. 2d at 881.  Among other things, the court held that the Department violated NEPA by shifting direction from the purposes identified for the Roadless Rule to a new set of goals, without considering less harmful alternatives that would respond to its new goals.  *Id.* at 905-07.

As a remedy, the court reinstated the Roadless Rule as it existed in May 2005, when USDA unlawfully repealed it.  *Id.* at 916-17.  Because the Tongass Exemption was in effect at that time, the court reinstated the Rule with this exemption, notwithstanding its intended temporary nature, *id.*, and enjoined violations of the Roadless Rule.  *Id.* at 919.

USDA and intervenors appealed.  The Ninth Circuit affirmed the district court in all respects in August 2009.  *Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999 (9th Cir. 2009).  This places USDA and the Forest Service in a position of potential conflict with the order of the Wyoming district court striking down the Roadless Rule.  This conflict may, though, be resolved by the pending appeal in the Tenth Circuit.  *See supra* p. 6.

VI.     ROADLESS AREA TIMBER SALES ON THE TONGASS.

As a result of this history, the Tongass now stands in a position unique among the national forests, languishing under a "temporary" exemption to the Roadless Rule after more than six years.  In 2005, the Ninth Circuit invalidated the overall management plan for the Tongass, and its EIS, because the Forest Service had mistakenly doubled its estimate of market demand for timber in the forest.  *NRDC v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005).  This

resulted in a consent decree that generally prohibited new roads and timber sales in roadless areas until the Forest Service published a new forest plan EIS, as required by the Ninth Circuit. Ex. 31 at 2-3 (Scratchings II ROD).

The Forest Service published an amended forest plan and new EIS in January 2008, terminating the decree's prohibitions. *Id.*; *see* Ex. 25 (2008 Plan FEIS). The amended plan places approximately 2.3 million acres of roadless areas in land use designations that allow development, including new roads and, where suitable, logging. Ex. 25 at 11 (2008 Plan FEIS) (Table 3.19-6, Alternative 6).[3] Following completion of the plan amendment, the Forest Service promptly began authorizing new timber sales and roads in roadless areas. Ex. 27 (Iyouktug ROD); Ex. 28 (Kuiu ROD); Ex. 31 (Scratchings II ROD). It did so despite the fact that logging levels on the Tongass never rebounded as predicted, but continue to decline, Ex. 30, and despite the large public expense of building roads for access to timber sales. Ex. 29.

VII. THIS CASE.

Plaintiffs include: the Organized Village of Kake, the federally recognized tribal government for the Native residents of Kake; the Alaska Wilderness Recreation & Tourism Association, a trade association for wilderness-dependent tourism businesses; The Boat Company, a non-profit cruise line; and several local and national conservation organizations with missions to advocate for protection of wilderness, natural resources, clean water, and clean air. Exs. 32-43 (organizational declarations). These organizations have members who live in or near the Tongass National Forest. They are Native subsistence hunters, big game guides, charter boat captains, tour operators, lodge owners, commercial fishers, and recreational users of the forest. These people use and enjoy roadless areas of the Tongass—including those where new roads and clearcuts have recently been authorized—for subsistence, business, and recreation. Exs. 32, 33, 39, 44-49 (member declarations). Plaintiffs have standing to bring this action, because they will suffer injuries in fact, traceable to Defendants' actions, that would be redressed by this Court setting aside the temporary Tongass Exemption and actions taken under it. *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-85 (2000).

---

[3] This figure may not be precise. The ROD for the plan amendment adopted Alternative 6 with slight modifications, but did not report precisely how many acres of roadless areas it placed in development land use designations. Ex. 26 at 11 (2008 Plan ROD).

**ARGUMENT**

I.     THE TONGASS EXEMPTION WAS ARBITRARY.

     A.     <u>Standards of Review</u>.

The Administrative Procedure Act (APA) directs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious…." 5 U.S.C. § 706(2)(A). This requires that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Specifically, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change…." *Id.* at 42. A decision would normally be arbitrary if the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency…." *Id.* at 43.

Thus, an action may be arbitrary if the agency's reasoning is not supported by evidence in the record. *See, e.g., Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1201-03 (9th Cir. 2008) ("there is no evidence to support NHTSA's conclusion"); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1037-38 (9th Cir. 2001).

A decision may also be arbitrary if the agency failed to consider a clear alternative, thereby ignoring an important aspect of the problem. *See, e.g., State Farm*, 463 U.S. at 48 ("At the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment"); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815-18 (D.C. Cir. 1983); *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) ("an agency has ignored relevant factors where its action amounts to an "'artificial narrowing of options' which is antithetical to reasoned decisionmaking" (quoting *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 817 (text alterations omitted))).

"The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

B.    The Decision to Exempt the Tongass from the Roadless Rule was Arbitrary.

In adopting both the Roadless Rule and the Tongass Exemption, USDA acted pursuant to several statutes that provide the standards to guide its decisions. Under the Organic Administration Act, the Secretary is authorized to adopt rules to "insure the objects of" the national forests and "to preserve the forests thereon from destruction…." 16 U.S.C. § 551. The National Forest Management Act requires the Secretary of Agriculture to install "a proper system of transportation . . . to meet anticipated needs on an economical and environmentally sound basis…." 16 U.S.C. § 1608(a). The Multiple-Use Sustained-Yield Act requires the Secretary to manage the national forests for "multiple use," 16 U.S.C. § 529, defined to mean:

> The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a).

Exercising its authority under these laws, USDA offered three principal rationales for temporarily exempting the Tongass from the Roadless Rule: ostensible interference with community road and utility connections; the supposed loss of 900 jobs; and the desire to reduce controversy and uncertainty from litigation. *See supra* p. 8. Each of these rationales is contrary to the evidence before the agency and therefore arbitrary.

### 1.    The Evidence does Not Show Interference with Community Connections.

The Exemption ROD broadly asserts that "the roadless rule significantly limits the ability of communities to develop road and utility connections…." Ex. 24 at 2 (col. 1). This assertion is unsupported by and contrary to the evidence in the record. Without explanation, it contradicts the agencies' findings just three years earlier, when they carefully decided to include the Tongass in the Roadless Rule. The agencies also failed to consider reasonable alternatives that would have answered these concerns (assuming they were well-founded) without taking the drastic step

of entirely exempting the nation's largest national forest from the Rule. For all these reasons, the rationale in the ROD is arbitrary.

> a. The Roadless Rule does not prevent construction of roads to connect communities in Southeast Alaska.

The Exemption ROD correctly recognizes two ways that new roads may be built to connect communities in Southeast Alaska: as Federal Aid Highways, or as logging roads, which are sometimes later upgraded to state highways. *Id.* at 8 (col. 1). However, no record evidence shows that the Roadless Rule will hinder potential community connections by either method.

*Federal Aid Highways.*

The Roadless Rule specifically allows construction of Federal Aid Highways. Ex. 11 at 30 (36 C.F.R. § 294.12(b)(6)). The Forest Service explained that "[t]his exception maintains the Secretary's discretion as it already exists." Ex. 9 at 41 (2000 FEIS); *see supra* pp. 5, 6. Looking specifically at the Tongass, the agency concluded: "Future major transportation routes are very likely, if not certain, to be Federal Aid Highway Projects. Thus, the Secretary would have discretion to approve such routes under the rule." Ex. 10 (Johnston & Riber). In the 2000 FEIS, the Forest Service determined that, quite apart from the operation of the Rule, "[i]t appears that in the reasonably foreseeable future, construction of State highways through inventoried roadless areas in Alaska may not be an issue." Ex. 9 at 98. In the 2003 SIR, the agency concluded that such roads "could go forward", Ex. 23 at 41, and that "no new information has come to light that would alter the expectations of major roads or transportation corridors...." *Id.* at 41.

Despite looking hard, the Forest Service was unable in 2003 to produce even one example of a transportation project that might be barred by the Roadless Rule. It reviewed an exhaustive document entitled "Southeast Alaska Proposed Public Road and Ferry Projects" as well as the "Southeast Alaska Transportation Plan." However, the only project the agency then cited as a transportation need regionally was a ferry for Prince of Wales Island, about which it conceded: "The Prince of Wales example will not directly affect inventoried roadless areas...." *Id.* at 40 (arguing without support that "other similar projects across the Tongass most likely would affect certain" roadless areas). The fact that the agency was unable to identify even a single project that might be affected by the Roadless Rule severely undermines USDA's conclusion that an exemption was needed to ensure community road connections. This is

particularly true considering the intended short-term duration of the exemption, covering only a period in which any major transportation projects that might have been obstructed by the Rule should have been readily foreseeable.

The Exemption ROD does no better at making the case that the Rule hinders real world transportation connections. In it, USDA points to the Rule's requirement, in section 294.12(b)(6), that the Secretary must determine that the project is in the public interest and that no other reasonable and prudent alternative exists. It asserts, again without citing any examples, that "[s]uch a finding may not always be possible for otherwise desirable road projects." Ex. 24 at 8 (col. 1). This assertion ignores the agencies' statements upon adoption of the Roadless Rule that it preserved the Secretary's existing discretion for any highway on a national forest. Ex. 9 at 41 (2000 FEIS); Ex. 11 at 22 (col. 3) (2001 ROD) ("the Secretary of Agriculture retains the discretion to approve or deny authorization when warranted (23 U.S.C. 317)."); *see* 23 U.S.C. § 317(b) (requiring finding similar to Roadless Rule section 294.12(b)(6)). Certainly, if there were a desirable project that within the intended short-term duration of the temporary exemption would have been hindered by the Roadless Rule's finding requirement, the agency should have been able to identify it. That the agency could not do so shows that the stated concern was without basis.

In short, USDA's speculation that something about the Roadless Rule may affect the ability to build Federal Aid Highways—particularly during the intended short-term duration of the exemption—was unsupported by and contrary to the evidence in the record, and it marked an unexplained reversal of the agencies' factual conclusions adopted in 2001. For these reasons, the agency's decision was arbitrary.

If USDA had genuinely been concerned that, contrary to its original findings, the "no reasonable and prudent alternative" requirement was a significant new restriction on building Federal Aid Highways, a reasonable alternative would have been simply to eliminate that restriction rather than throwing out the entire Roadless Rule for the entire Tongass. However, the agency never addressed this possibility. Failure to consider such an obvious and less drastic alternative ignores an important aspect of the problem and renders the decision arbitrary.

Another obvious alternative, if this concern were legitimate, would have been to exempt Southeast Alaska transportation corridors from the Roadless Rule. These corridors had been identified, mapped, and listed in the Tongass Land Management Plan earlier that year, and

assigned to a "Transportation and Utility Systems" land use designation. Ex. 18 at 16, 18-20 (2003 Plan FSEIS). Yet, USDA never considered this possibility in adopting the Tongass Exemption. This, too, rendered the decision arbitrary.

*Logging roads as community links.*

No better supported was USDA's assertion in the ROD that the Roadless Rule would prevent construction of logging roads connecting communities, "which may be critical to economic survival of many of the smaller communities in Southeast Alaska." Ex. 24 at 8 (col. 1). The ROD correctly notes that past logging roads upgraded to state highways have connected the communities on Prince of Wales Island. *Id.* However, it ignores the fact that those communities were by 2003 already connected, and that other communities in the region are not plausible candidates to be connected by logging roads. Ex. 10 (Johnston & Riber) ("Most of the other communities in Southeast Alaska are so isolated that roaded access is unlikely to be proposed."). The Roadless Rule would act as a bar to any such connections only if the Forest Service would, but for the Rule, plan and sell a timber sale requiring roads through a roadless area connecting communities that (1) had not already been connected during the boom years of the pulp mills and (2) could not be connected by roads consistent with the Rule.

So unlikely is this scenario that the FEIS for the Roadless Rule did not even address it. Referring to planned logging roads in inventoried roadless areas of the Tongass, the FEIS states that "[a]lmost all of these roads will be maintained for high-clearance vehicles or closed between timber sales." Ex. 9 at 84. It makes no mention of potential community connections, and the 2003 SIR states that "new information or new circumstances have not been presented." Ex. 23 at 40. Logging roads as community connections were a nonissue in 2001, yet somehow became, without factual support, an issue "critical to economic survival" for "many" communities in the 2003 ROD. Ex. 24 at 8 (col. 1).

If this were true, the agencies would have been able to identify those communities and the potential timber sales that could connect them. That they could not reveals that the concern was unfounded, particularly for the intended short-term duration of the temporary exemption. The ROD's assertions regarding logging roads as community connections were unsupported by and contrary to the evidence in the record, and marked an unexplained reversal of the agencies' conclusions adopted in 2001. In a word, they were arbitrary.

b.      The Roadless Rule does not prevent construction of utility lines.

For similar reasons, the ROD's finding that a temporary exemption was needed to allow construction of utility lines was also arbitrary.  *See* Ex. 24 at 2 (col. 1) (Roadless Rule "significantly limits" utility connections).  The Roadless Rule does not prohibit construction of utility lines, and the record unequivocally shows that roads are not needed to build them.  The agencies' statements to the contrary, without evidence or explanation, contradict their own well-supported findings made when the Roadless Rule was adopted.  Had legitimate concerns existed over the ability to construct needed utility lines, there were reasonable options to address them short of exempting the entire forest.  For these reasons, the findings in the ROD are arbitrary.

The agencies addressed this issue in 2001 and found—based on evidence in the record—that the Roadless Rule would not have a major effect on the construction of utility lines. The FEIS, citing a recent study, notes that "only a couple of proposed corridors in the Western States may be affected by the prohibitions," and then goes on to say it is unknown whether the Rule would preclude even those being built through roadless areas.  Ex. 9 at 77.  It concludes that any effects would be "minimal."  *Id.*  The SIR, in turn, concludes that "new information or new circumstances have not been presented."  Ex. 23 at 40.

The Exemption ROD contains no actual evidence of interference with utility connections that would contradict the findings in the 2001 FEIS and the SIR.  Tellingly, in the ROD the agency did not assert that any specific planned or potential utility connection might be impeded by the Roadless Rule.  This omission is all the more striking given the temporary nature of the Exemption.  USDA was in the untenable position of saying it had to suspend the Rule immediately to allow for construction—before it could complete a permanent new rule—of utility connections it could not even name.

Part of the reason there are no actual examples is the flexibility built into the Roadless Rule itself.  The Rule as adopted contains an exception that allows for cutting of trees incidental to otherwise authorized activity.  Ex. 11 at 31 (36 C.F.R. § 294.13(b)(2)).  That allowance was explicitly adopted in part to permit clearing of utility corridors.  *Id.* at 16 (col. 2).

The only stated basis for USDA's conclusion that the Rule may interfere with utility lines in Southeast Alaska was that some utility corridors "may" require a road, or be more expensive without one.  Ex. 24 at 8 (col. 1).  This statement—speculative on its face—is wholly

unsupported by the record, contrary to the agency's well-supported findings discussed above, and contrary to other evidence in the record.

Utility connections in Southeast Alaska are commonly built without roads even absent federal restrictions. In 2000, Forest Service officials produced a short "Information Brief" that examines the question. It cites a 50-mile intertie route from Wrangell to Petersburg "which did not require one mile of road construction." Ex. 10 (Johnston & Riber). It also mentions a submarine intertie from Haines to Skagway. *Id.* And it explains that the final decision for the Swan-Tyee Intertie, made before adoption of the Roadless Rule, included no road construction. *Id.* The decision to build the Swan-Tyee Intertie without roads was based on lower costs for both construction and operation. Ex. 2 at 26 (Swan-Tyee FEIS); Ex. 3 at 18 (Swan-Tyee ROD). This intertie was built accordingly, even though the Roadless Rule was not at that point in force on the Tongass. Ex. 25 at 8 (2008 Plan FEIS). Other utility connections in the region have similarly been built without roads. Exs. 13-15 (maps of Bradfield Canal, Blake Channel, and Snettisham connectors).[4]

Moreover, in the unlikely event that a road were needed to construct a utility line, the Roadless Rule provides ample flexibility to do so. As discussed above, the only roads connecting communities that are likely to be built would be Federal Aid Highways, which are allowed by the Roadless Rule. In the absence of a highway, the Rule allows heavy motorized equipment in linear "construction zones" for utility connections through roadless areas. *See Wilderness Workshop v. U.S. BLM*, 531 F.3d 1220, 1227-1228 (10th Cir. 2008).

Finally, if there had been some basis for the ROD's conclusion that the Roadless Rule could prevent construction of utility lines in the short term, it was certainly not necessary to exempt the entire forest from the Rule to address that concern. The Roadless Rule was never intended or predicted to stop utility lines. As with Federal Aid Highways, an obvious alternative would have been to exempt the Transportation and Utility Corridors identified in the forest plan from the Rule. *See supra* pp. 14-15; Ex. 18 at 16, 20-21 (2003 Plan FSEIS). Yet, USDA never even advanced this as a possibility in adopting the Tongass Exemption.

---

[4] Exhibit 15 does not identify the Snettisham line by name, but it can easily be seen as the narrow, yellow strip from the powerhouse below Long Lake, along the beach around Port Snettisham and under Taku Inlet to Juneau.

The ROD's assertions regarding utility connections were unsupported by and contrary to the evidence in the record, and marked an unexplained reversal of the agencies' factual conclusions adopted in 2001. They also ignored an obvious and less drastic alternative. For these reasons, they were arbitrary.

<strong>2.</strong>    <em>No Job Loss was Attributable to the Roadless Rule.</em>

In addition to community connectivity, USDA mistakenly placed great weight on job loss in, and related to, the timber industry. It stated that "substantial negative economic impacts are anticipated if the roadless rule is applied to the Tongass, which include the potential loss of approximately 900 jobs in Southeast Alaska. With the adoption of this final rule, the potential negative economic effects should not occur…." Ex. 24 at 7 (col. 1) (Exemption ROD).

The assertion that application of the Roadless Rule to the Tongass would cost 900 jobs is misleading and contrary to the evidence. The record showed in 2003 that the existing jobs could have been, and still could be, comfortably sustained in perpetuity consistent with the Roadless Rule. As noted, total Tongass logging in the three years preceding the Tongass Exemption averaged 44 mmbf annually. *Id.* at 6 (col. 1). Forest Service calculations in 2003 showed that timber sales restricted just to roaded areas could be expected to generate annual logging of 55 mmbf. Ex. 23 at 26 (SIR). That estimate discounted an allowable sales level of 96 mmbf to account for economic factors and historic shortfalls between sales and harvest levels. *Id.* It also corresponded closely with the estimate in the 2000 FEIS that it was possible to continue a Tongass timber sale program of 50 mmbf/year indefinitely under the Roadless Rule. *Id.* at 26-27; *see* Ex. 9 at 88 (2000 FEIS). Thus, under the Roadless Rule, it was possible to continue the timber sale program in the Tongass at equal or higher levels, without losing even one job. The statement that the Rule could cause the loss of 900 jobs—the main ostensible economic cost of the Rule—was contrary to the evidence and therefore arbitrary.

The 2000 FEIS did estimate that the Rule could cause a 77 mmbf annual logging reduction from projected levels and an associated loss of up to 895 direct and indirect jobs in private industry and the Forest Service. Ex. 9 at 88-90 (2000 FEIS). However, by 2003, this reduction in logging and more—from 146 mmbf in 1999 to an average of 44 mmbf in 2001-03, Ex. 24 at 6 (col. 1) (Exemption ROD)—had already occurred due to structural changes in the industry. The Forest Service itself recognized in 2000 that "[t]he Southeast Alaska timber

industry is undergoing a fundamental transformation…." Ex. 9 at 85 (2000 FEIS). Logging until then had been dominated by two large-scale pulp mills, both of which closed in the 1990s. *Id.* By 2003, the Forest Service recognized that "[c]losure of these mills has had a significant effect on the regional demand for timber…." Ex. 18 at 22 (2003 Plan FSEIS). It caused a substantial decline in employment, which the Forest Service projected would continue. *Id.* at 24. In fact, since the end of logging under the last pulp mill contract in 2000, logging on the Tongass has never again exceeded 51 mmbf. Ex. 30. Significantly, this decline occurred without operation of the Roadless Rule, the implementation of which had been almost continuously enjoined before the 2003 Exemption suspended it. *See Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999, 1006-07 (9th Cir. 2009). For these reasons, it was misleading and contrary to the evidence in the record—and therefore arbitrary—for USDA to assert in the Exemption ROD that a temporary exemption was needed to prevent a further loss of 900 jobs.[5]

Even if the agency had been concerned, against the evidence, about a sudden upsurge of market demand for Tongass logging, that would not have supported a near-term exemption from the Roadless Rule. There were multiple sources of timber available to accommodate any possible spike in demand. First, the Rule was adopted with a huge cushion of Tongass timber sales, 852 mmbf, exempted from operation of the Rule. Ex. 11 at 24 (col. 2) (2001 ROD). Added to roaded area sales, that would be enough to accommodate a doubling or tripling of logging for many years to come, far beyond the reasonable life of any temporary exemption. Second, the estimated 50-55 mmbf/year that could be logged from roaded areas in perpetuity is not an annual limit. The Forest Service could exceed it on a temporary basis in any given year if needed to meet demand, as long as the agency did not exceed the decadal limit of 2.59 billion board-feet set by the forest plan. Ex. 18 at 12 (2003 Plan FSEIS); Ex. 19 at 11 (2003 Plan ROD); *see* 16 U.S.C. § 1611(a). For these reasons, unexpected demand for Tongass logs would not require a near-term exemption from the Roadless Rule. The agency failed to consider an important aspect of the problem by overlooking these facts, rendering the decision arbitrary.

---

[5] Indeed, it is unlikely that 900 timber-related jobs even existed in 2003. This figure was based on the FEIS's estimate that a 77 mmbf logging reduction could cause a loss of up to 895 jobs. Ex. 9 at 88-90 (2000 FEIS). This implies a ratio of 11.6 jobs/mmbf. At that ratio, with a prevailing cut level of 44 mmbf/year, there would have been only about 510 total jobs in 2003. It was thus not possible to lose 900 jobs even if the entire industry were wiped out.

### 3.    *The Tongass Exemption Could Not Reduce Uncertainty.*

The assertion that the Tongass Exemption was needed to enhance certainty is perhaps the agency's least availing.  By its nature, a temporary exemption cannot produce long-term predictability.  USDA's contrary conclusion lacks a rational explanation, ignores the temporary nature of the rule, and is a clear error of judgment.

It is possible, of course, that USDA meant that it was getting the jump on a forthcoming permanent exemption.  It would, however, have been patently illegal to prejudge, let alone count on, the outcome of a permanent rulemaking.  *See, e.g.*, *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978) (striking rule and noting purposes behind APA rulemaking procedures include ensuring "agency maintains a flexible and open-minded attitude").  Moreover, the agency expressly foreswore such a predetermination.  It stated categorically in the Exemption ROD that "[p]romulgating this final rule would not prejudice the ultimate decision on the advance notice of rulemaking" for an Alaska-specific directive.  Ex. 24 at 8 (col. 3).  In the absence of an (illegal) predetermination, the temporary exemption did not, and could not, contribute to certainty.

The Exemption was all the more incapable of producing certainty because what USDA said it sought was certainty about litigation risks.  *Id.* at 3 (col. 1).  As described above, moving the timber sale program back into Tongass roadless areas could not, based on all the evidence in front of the agency, be expected to avoid litigation.  Indeed, one of the principal stated purposes of the Roadless Rule, as well as its predicted effect, was to reduce the controversy, appeals, and litigation caused by proposals for new roads and logging in roadless areas, including specifically in the Tongass.  *See supra* pp. 2, 3, 4; Ex. 9 at 28-29, 61 (2000 FEIS).  Yet, the Exemption ROD asserts that "this final rule reduces the potential for conflicts," Ex. 24 at 3 (col. 2), without even acknowledging the agencies' exact opposite conclusion reached in 2001.  The complete failure to address the conflict cause by roadless area logging ignores an important aspect of the problem and amounts to an unexplained reversal of agency findings, rendering it arbitrary.

## II.    THE ROADLESS EXEMPTION VIOLATED NEPA.

In refusing to prepare an EIS for the Tongass Exemption, USDA misconstrued and failed its primary obligation under NEPA.  The "heart" of NEPA is the formulation and consideration of alternatives to the agency's preferred course of action, alternatives that serve the agency's ends with lowered harm or risk to the environment.  What alternatives an agency must study are

governed by its "purpose and need" for action. Here, the agency relied on the Roadless Rule EIS to cover exclusion of the Tongass. The Roadless Rule, however, responded to a quite different articulated purpose and need than motivated the Exemption. USDA thus failed to develop, study the effects of, and solicit agency comment on reasonable alternatives that could have served this new purpose and need, with less adverse impact on the environment than outright exemption of the Tongass from the Roadless Rule's protections. Its failure was a serious violation of NEPA.

A.    Standards of Review.

Review for compliance with NEPA occurs under the provision of the APA that authorizes courts to set aside agency actions adopted "without observance of procedure required by law." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1165 (9th Cir. 2003) (quoting 5 U.S.C. § 706(2)(D)). When the question before the court is predominately a legal one, and not the sort of factual one implicating agency expertise, the applicable standard of review is reasonableness. *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).

B.    NEPA Requires Federal Agencies to Consider Alternatives to their Proposals.

The goal of NEPA is "to ensure that federal agencies infuse in project planning a thorough consideration of environmental values." *Id.* at 729 (quoting *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (internal quotation marks and citations omitted)). NEPA requires that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1020 (9th Cir. 2009) (quoting 40 C.F.R. § 1502.14(a)). Indeed, the purpose of an EIS, in addition to full disclosure of environmental impacts from a proposal, is "to inform decision makers and the public of reasonable alternatives that would minimize adverse environmental impacts." *Cal. ex rel. Lockyer,*, 575 F.3d at 1012 (citing 40 C.F.R. § 1502.1); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006) ("The consideration of alternatives requirement . . . guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit balance." (quoting *Bob Marshall Alliance*, 852 F.2d at 1228)). "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives" that an agency needs to

*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS
21
Case 1:09-cv-00023-JWS    Document 42    Filed 07/02/10    Page 28 of 37

develop, study, and take comment on.  *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

The investigation of environmentally beneficial alternatives to a proposal is often described as the "heart" of an EIS.  *See, e.g., Or. Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1121 (9th Cir. 2008); *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005); *Pit River Tribe*, 469 F.3d at 785.  Its source is, in part, the congressional admonition that an EIS must address "alternatives to the proposed action…."  42 U.S.C. § 4332(2)(C)(iii).  Thus, the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  *NRDC v. U.S. Forest Serv.*, 421 F.3d at 813 (quoting *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)).

However, the alternatives requirement is "critical to the goals of NEPA" even when the scope and potential impact of a proposal do not trigger the need for an EIS.  *Bob Marshall Alliance*, 852 F.2d at 1228-29.  A section of NEPA separate from the EIS requirement mandates that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  "Thus the consideration of alternatives requirement is both independent of, and broader than, the EIS requirement."  *Bob Marshall Alliance*, 852 F.2d at 1229.  It applies to "any proposed federal action involving unresolved conflicts as to the proper use of resources . . . whether or not an EIS is also required."  *Id.*

C.     The Agency Unlawfully Failed to Analyze Alternatives that Would Address the Stated Purposes of the Tongass Exemption.

USDA erroneously did not develop and consider alternatives that responded to its stated purpose in proposing the Tongass Exemption, alternatives that would reduce or eliminate environmental harm.  The agency decided, based on the SIR, not to prepare an EIS for the Exemption, but instead to rely on the one for the Roadless Rule.  Ex. 24 at 6 (col. 3) (Exemption ROD).  The only alternatives it considered were those from the Roadless Rule EIS.  *Id.* at 9 (col. 1).  It mistakenly assumed that the EIS for a different and prior decision fulfilled its NEPA duties as long as it could deem factual circumstances and information not significantly changed during the intervening years.  *Id.* at 6 (col. 2).  In so doing, it ignored that a core component of NEPA analysis is a set of harm-reducing alternatives that respond to the agency's specific purpose.  *See Cal. ex rel. Lockyer*, 575 F.3d at 1012.

The 2000 EIS could not meet the agency's NEPA obligation to study alternatives to the Tongass Exemption. The Roadless Rule process had, and its EIS reflected, a fundamentally different purpose from the Exemption. The Forest Service succinctly described it thus: "The purpose of this action is to immediately stop activities that pose the greatest risks to the social and ecological values of inventoried roadless areas." Ex. 9 at 6 (2000 FEIS). By contrast, the Exemption's purpose was to mitigate: (1) perceived interference with community road and utility connections; (2) job loss; and (3) uncertainty attributable to litigation. *See supra* p. 8. That quite different purpose put the Forest Service in the same situation here as it was in *Sierra Forest Legacy*, where "introduction of these new objectives plainly constituted a change in circumstances that is 'relevant to the development and evaluation of alternatives' that USFS 'must account for . . . in the alternatives it considers.'" 577 F.3d at 1021-22 (quoting *NRDC v. U.S. Forest Serv.*, 421 F.3d at 813). In fact, the change of purpose from protecting the environment to loosening development restrictions heightened the agency's obligation to formulate and consider environmentally preferable alternatives. *See Kootenai Tribe of Idaho v. Veneman,* 313 F.3d at 1120 (9th Cir. 2002). And USDA's defense, that it was borrowing alternatives from the differently motivated Roadless Rule EIS, is no more valid for the Tongass Exemption than it was for the State Petitions Rule. *See Cal. ex rel. Lockyer v. USDA*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009).

Had there been any substance to USDA's rationale for the Tongass Exemption, alternatives with far lower environmental impact could readily have been evaluated and circulated to the public and sister agencies. For example, as discussed above, if the agency had a well-grounded basis (not apparent from the existing record) for its concern that the Roadless Rule might prevent needed community road and utility connections, it could have considered an alternative exempting the forest plan's recently identified Transportation and Utility Corridors, or some subset of specific foreseeable projects, rather than jettisoning the Rule entirely. *See supra* pp. 14-15, 17. Similarly, it could have considered an alternative with a more relaxed highway exemption. *See supra* p. 14. If the agency were concerned about resurgent demand during the short intended duration of the temporary exemption, it could have relied on the pipeline of hundreds of millions of board feet in grandfathered timber sales, or, if even that were insufficient, it could have temporarily accelerated logging in roaded areas. *See supra* p. 19. Or it could have opened up a small number of roadless areas that it determined, with public input, to

*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS
23
Case 1:09-cv-00023-JWS    Document 42    Filed 07/02/10    Page 30 of 37

be least likely to engender conflict. These options would not only have dealt with concerns about loss of 900 jobs, had they actually existed in 2003, they would also have lowered the risk of controversy and litigation. Failure to develop such alternatives rendered the agency's decision as illegal as in *NRDC v. U.S. Forest Service*, where it "omit[ted] the viable alternative of allocating less unspoiled area to development" and thereby violated NEPA. 421 F.3d at 814.

Though it did not prepare an EIS for the Tongass Exemption, USDA does not appear to dispute the applicability of the EIS requirement. It says, rather, that it was selecting an alternative from the 2000 EIS. Ex. 24 at 1 (col. 2) (Exemption ROD). At all events, the need for EIS review of the Exemption is inarguable. At issue were potential incursions into approximately 2.3 million acres of pristine wildlands left open to development under the pre-existing forest plan. *See supra* p. 10. The agency had already determined that the Roadless Rule "would reduce risks to old growth ecosystems, species viability, and diversity, and would lower risk to fish and wildlife species that are valued for recreational hunting, fishing, and viewing and for subsistence" in the Tongass and would maintain "the wild and unspoiled nature of many inventoried roadless areas." Ex. 9 at 12 (2000 FEIS). As noted above, however, even if no EIS were required for the Exemption, USDA would still have had to develop and consider reasonable alternatives to its proposal. *See supra* p. 22.

III.    THE EXEMPTION AND ACTIONS IMPLEMENTING IT SHOULD BE VACATED,
        AND THE ROADLESS RULE REINSTATED ON THE TONGASS.

Because Federal Defendants acted arbitrarily and in violation of NEPA, Plaintiffs request that the Court vacate the Tongass Exemption, reinstate the Roadless Rule on the Tongass, and vacate actions inconsistent with the Rule as specified in the attached proposed order.

The normal remedy under the APA for an arbitrary or unlawful agency action is to vacate the agency's action. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005); *NRDC v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *W. Oil & Gas Ass'n v. U.S. EPA*, 633 F.2d 803, 813 (9th Cir. 1980); *see* 5 U.S.C. § 706(2)(A) (court shall set aside arbitrary or unlawful actions). "The effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen*, 413 F.3d at 1008. The Roadless Rule was validly adopted, with a full EIS and unprecedented public process, in compliance with all applicable laws. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002). In these circumstances, it is appropriate to vacate the Tongass Exemption and

reinstate the Roadless Rule on the Tongass.  *See Cal. ex rel. Lockyer*, 575 F.3d at 1020 (affirming reinstatement of Roadless Rule elsewhere after repeal set aside).

Because portions of the Iyouktug, Kuiu, and Scratchings II timber sale decisions would violate the Roadless Rule, the violating portions should also, with one exception, be vacated.  In the circumstances of this case, Plaintiffs request only partial vacatur of the Iyouktug timber sale decision.  One of the Plaintiffs—the Southeast Alaska Conservation Council—settled its administrative appeal of that sale to allow specified timber cutting units and their associated roads, some of which were located in roadless areas, to proceed without further challenge.  The proposed order excludes those units.

There are no equitable circumstances here requiring any less relief.  The Forest Service admits that excluding the Tongass from the Roadless Rule would cause harm to subsistence, fish, wildlife, recreational hunting and fishing, biodiversity, scenery, remote recreation, and adventure tourism.  Ex. 9 at 83, 88, 91, 99-100 (2000 FEIS).  Members of the Plaintiff organizations use the roadless areas of the Tongass—including those in the specified timber sales—for these very purposes and values.  Exs. 32, 33, 39, 44-49 (declarations).

**CONCLUSION**

For the foregoing reasons, Plaintiffs request the Court to hold that Federal Defendants acted arbitrarily and in violation of NEPA in adopting the Tongass Exemption.  They further request that the Court vacate the Exemption, reinstate the Roadless Rule in the Tongass, and vacate decisions inconsistent with the Roadless Rule as specified in the proposed order.

Respectfully submitted this 2nd day of July 2010,

s/ *Thomas S. Waldo*
Thomas S. Waldo (ABA# 9007047)        Nathaniel S.W. Lawrence
Eric P. Jorgensen (ABA # 8904010)        NATURAL RESOURCES
EARTHJUSTICE                                            DEFENSE COUNCIL
325 Fourth Street                            3723 Holiday Drive, SE
Juneau, AK 99801                            Olympia, WA 98501
T: 907-586-2751                            T: 360-534-9900
F: 907-463-5891                            F: 360-534-9909
E: twaldo@earthjustice.org                E: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

*Organized Village of Kake v. USDA*                25
1:09-cv-00023-JWS
Case 1:09-cv-00023-JWS        Document 42        Filed 07/02/10        Page 32 of 37

**CERTIFICATE OF SERVICE**

I, Thomas S. Waldo, certify that on July 2, 2010, a true and correct copy of the foregoing PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1) was served electronically on Barclay T. Samford, Thomas E. Lenhart, Scott W. Horngren, and Julie A. Weis.


s/ *Thomas S. Waldo*
Thomas S. Waldo

# TABLE OF EXHIBITS

| Exhibit No. | AR No. | Description |
|---|---|---|
| 1 | 10_006971 | USDA Forest Service, Tongass Land Management Plan Revision, Final Environment Impact Statement (Jan. 1997) (excerpts) |
| 2 | 401_4000d | USDA Forest Service, Swan Lake-Lake Tyee Intertie, Final Environmental Impact Statement (Aug. 1997) (excerpts) |
| 3 | 401_4000b | USDA Forest Service, Swan Lake-Tyee Lake Intertie, Record of Decision (Aug. 29, 1997) (excerpts) |
| 4 | 1535 | Memorandum from President Clinton to Secretary of Agriculture, Re: Protection of Forest "Roadless" Areas (Oct. 13, 1999) |
| 5 | 1608 | USDA Forest Service, Notice of intent to prepare an environmental impact statement: National Forest System Roadless Areas, 64 Fed. Reg. 56, 306 (Oct. 19, 1999) |
| 6 | 1350 | USDA Forest Service, Notice of proposed rulemaking; request for comment: Special Areas; Roadless Area Conservation; Proposed Rules, 65 Fed. Reg. 30,276 (May 10, 2000) |
| 7 | 1362 | USDA Forest Service, Roadless Area Conservation, Draft Environmental Impact Statement (May 2000) (excerpts) |
| 8 | 5093 | E-mail, with attached memo and regulations, from Scott Conroy, Roadless Area Conservation Project Director, USDA, Forest Service, to Chris Wood, Senior Policy and Communications Advisor, USDA, Forest Service, Re: Federal Aid Highways (Oct. 31, 2000) |
| 9 | 0401_3997 | USDA Forest Service, Roadless Area Conservation, Final Environmental Impact Statement (Nov. 2000) (excerpts) |
| 10 | 5847 | Draft "Informational Brief" Re: Southeast Alaska Transportation Plan and Intertie (Dec. 5, 2000) |
| 11 | 5796 | USDA Forest Service, Final Rule, Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244 (Jan. 12, 2001) |

| 12 | 12_00754 | Order, *Sierra Club v. Lyons*, No. J00-0009-cv-JKS and *Alaska Forest Ass'n, v. U.S.D.A.*, No. J99-0013-cv-JKS (D. Alaska Mar. 30, 2001) (excerpts) |
|----|----------|---|
| 13 | 12_00216 | Roadless Area 207 Map (Apr. 25, 2002) |
| 14 | 12_00255 | Roadless Area 290 Map (Apr. 25, 2002) |
| 15 | 12_00257 | Roadless Area 302 Map (Apr. 25, 2002) |
| 16 | 12_00747 | Order, *Sierra Club v. Rey*, No. J00-0009-cv-JKS (D. Alaska Apr. 26, 2002) |
| 17 | 13_41299 | USDA Forest Service, Region 10, Tongass National Forest, Forest-Level Roads Analysis, prepared by Foster Wheeler Environmental Corporation (Jan. 2003) |
| 18 | 10_00077 | USDA Forest Service, Tongass Land Management Plan Revision, Final Supplemental Environmental Impact Statement (Feb. 2003) (excerpts) |
| 19 | 10_00081 | USDA Forest Service, Tongass Land Management Plan Revision, Record of Decision (Feb. 24, 2003) (excerpts) |
| 20 | 0401_wo_t112 | Settlement, *State of Alaska v. U.S. Dep't. of Agriculture*, No. A01-039-CV (JKS) (D. Alaska June 3, 2003) |
| 21 | 0401_wo_t051 | USDA Forest Service, Advance notice and notice of proposed rulemakings; request for comment: National Forest System Land and Resource Management Planning; Special Areas; Roadless Area Conservation; Proposed Rules, 68 Fed. Reg. 41,864 and 41,865 (July 15, 2003), |
| 22 | 0401_wo_t112 | Order, *State of Alaska v. U.S. Dep't. of Agriculture*, No. A01-039-CV (JKS) (D. Alaska July 23, 2003) |
| 23 | 00105 | USDA, Forest Service, Supplemental Information Report; Proposed Revision, Roadless Rule, 36 CFR Part 294 for Tongass National Forest (Oct. 2003) |
| 24 | 0401_ii301 | USDA Forest Service, Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed. Reg. 75, 136 (Dec. 30, 2003) |

| 25 | 603_1591 | USDA Forest Service, Tongass Land and Resource Management Plan Amendment, Final Environmental Impact Statement (Jan. 2008) (excerpts) |
| 26 | 603_1606 | USDA Forest Service, Tongass Land and Resource Management Plan Amendment, Record of Decision (Jan. 23, 2008) (excerpts) |
| 27 | 401_4003a | USDA Forest Service, Iyouktug Timber Sales, Record of Decision (Apr. 10, 2008) (excerpts) |
| 28 | 401_4001a | USDA Forest Service, Kuiu Timber Sale Area, Record of Decision (May 13, 2008) (excerpts) |
| 29 | 603_2028 | Roads to Nowhere, Tongass National Forest 2002 – 2006, Exhibit C to The Wilderness Society's Administrative Appeal of 2008 Tongass Land and Resource Management Plan Amendment (May 14, 2008) |
| 30 | 603_2028 | Tongass National Forest Timber Volume Cut (1952-2007), Exhibit E to The Wilderness Society's Administrative Appeal of 2008 Tongass Land and Resource Management Plan Amendment (May 14, 2008) |
| 31 | 401_4002c | USDA Forest Service, Scratchings Timber Sale, Record of Decision II (July 21, 2008) (excerpts) |
| 32 | | Declaration of Casimero A. Aceveda Jr., Organized Village of Kake |
| 33 | | Declaration of Joel Hanson, The Boat Company |
| 34 | | Declaration of Hanna Waterstat, Alaska Wilderness Recreation and Tourism Association |
| 35 | | Declaration of Mark Rorick, Sierra Club |
| 36 | | Declaration of Robert E. Lindekugel, Southeast Alaska Conservation Council |
| 37 | | Declaration of Sharon Buccino, Natural Resources Defense Council |
| 38 | | Declaration of Victoria McDonald, Tongass Conservation Society |

*Organized Village of Kake v. USDA*
1:09-cv-00023-JWS
iii
Case 1:09-cv-00023-JWS   Document 42   Filed 07/02/10   Page 36 of 37

39              Declaration of Larry Edwards, Greenpeace

40              Declaration of Sylvia Geraghty, Wrangell Resources Council

41              Declaration of Taylor McKinnon, Center for Biological
                Diversity

42              Declaration of Peter Nelson, Defenders of Wildlife

43              Declaration of Daniel Kruse, Cascadia Wildlands

44              Declaration of Irene Alexakos

45              Declaration of David Beebe

46              Declaration of Joel Jackson

47              Declaration of Mike McKimens

48              Declaration of Joseph Sebastian

49              Declaration of Natalie Dawson